No. 32,882

A. H. KRUEGER, *Appellant,* v. CARL SCHLEMEYER et al., *Appellees.*

(66 P. 2d 395)

470

*Oscar Ostrum* and *Frances K. Seeley,* both of Russell, for the appellant.

*W. L. Sayers,* of Hill City, and *James D. Conway,* of Hastings, Neb., for the appellees.

The opinion of the court was delivered by

ALLEN, J.:  This appeal involves two replevin actions for certain oil-well equipment.  Both suits were by Krueger against Schlemeyer *et al.* on the same cause of action.  Judgment was in favor of defendant Schlemeyer for possession of the property and for damages for its wrongful detention.  Plaintiff appeals.

The replevin actions were numbered 5345 and 5365.  By agreement, a jury trial was waived and both actions were tried at the same time by the court.  Upon request, the court returned findings of fact and conclusions of law.

It appears that prior to 1931 two syndicates, composed of residents of Nebraska, owned jointly certain oil and gas equipment located near Morland, Kan.  One syndicate was known as the "Hastings Interests" and was represented by J. H. Uerling.  He later resigned and was succeeded by James D. Conway.  The other syndicate was known as the "Grand Island Interests" and was represented by Faidley and Tully.  Each group owned an undivided interest in the drilling equipment.

The defendant Schlemeyer is an oil driller.  In November, 1931, Uerling, Tully and Faidley, representing the owners, entered into an agreement with defendant Schlemeyer whereby defendant was to have the possession and use of the drilling equipment.  The owners were to pay certain amounts of money to defendant when defendant had drilled a hole 4,000 feet deep, or a commercial well was brought in at less depth.  While the agreement did not fix a limit on the depth of the well, it did provide it was to be completed within a reasonable time.

The drilling equipment owned by the syndicates consisted of two rotary rigs.  One was what was denominated as a small rig, con-

sisting of No. 2 Acme draw works and certain equipment suitable for use with the same. This small rig was stored on the St. John lease near Morland. The large rig was known as the Ideal rotary rig. It was described as having a 7½-inch drawbar, while the small rig had a 4-inch drawbar. This equipment was delivered to Schlemeyer to drill a test well on the Smith farm southeast of Morland. He agreed to keep the tools and equipment free from liens.

While defendant was thus in possession of the tools and equipment, and about January, 1933, the plaintiff Krueger negotiated with Uerling for the leasing of the small rig. The contract executed by the owners with Krueger designated the equipment he was to get as a small rotary rig. As the identity of this property is the real point in dispute, the findings of fact by the court are important. After finding that the representatives of the syndicates, Faidley, Tully and Uerling, had entered into a contract with the plaintiff, Krueger, for the rental of oil-drilling machinery, the court found:

"At the time said contract was signed, and for several years prior thereto, the second parties owned certain oil-drilling machinery, consisting of substantially two rotary drilling rigs and equipment therefor, located near Morland, Kan. One of said rigs is characterized as an Acme No. 2 draw works, carrying a 5½-inch drum shaft, the same being located on what is known as the St. John location, a short distance southwest of Morland, Kan., while the other is what is known as a 7½-inch R. B. Ideal draw works, carrying a drum shaft of substantially 7½-inch diameter. The R. B. Ideal draw works weighs substantially 3,000 pounds more than the former-mentioned Acme No. 2 draw works.

"The negotiations on behalf of owners were conducted by J. H. Uerling, trustee. In the early part of January, 1933, the negotiations had reached the stage where it was suggested that a contract should be prepared and submitted, and the plaintiff volunteered to write and submit the contract. He thereupon prepared a contract dated the............day of............, 1933, by and between A. H. Krueger, of Natoma, Kan., as party of the first part, and John Uerling, as trustee, of Hastings, Neb., as party of the second part. The contract recited that plaintiff desired to drill by rotary to a depth of the top of the Oswald lime, at approximately 3,200 feet, and setting the casing. The contract also recites:

" 'First party agrees to furnish the derrick ready to set up the rotary machinery.'

"The proposed contract also recites that second party owned and controlled a complete rotary oil-drilling rig, crown block and shieves, also tools and equipment amply sufficient for the drilling of an oil well to a depth of 4,000 feet. This contract also provides, 'Second party also agrees to furnish as extra equipment............feet of 3-inch water line, together with pump and engine, if needed by first party.'

"Said contract was submitted to Mr. Uerling, either by mail or by sending the same to him by other means. The evidence shows that there were no further negotiations between the parties until the date of the signing of the contract set out in finding No. 2 hereof. When Uerling received the contract he did not find it satisfactory, and he proceeded to prepare another contract, the same being the contract which was later executed. In the contract prepared by Uerling the derrick was not mentioned; the word 'complete' was omitted in the description of the rotary rig. The names of Faidley and Tully were added as second parties, and the provision for the furnishing 'extra equipment............feet of 3-inch water line, together with pump and engine,' was omitted. This contract prepared by Uerling was taken by him to Woodston, Kan., and after a consultation between the parties thereto, the plaintiff induced Uerling to amend the original draft by inserting the words 'and elements expected.' With this addition, the contract was signed by the plaintiff and thereafter signed by the owners. The contract that was executed contained the following provision, which was not mentioned in the proffered contract, viz.: 'This machinery to be in charge of Carl Schlemeyer, now of Morland, Kan., and under his supervision.'

"About the time the negotiations with Uerling were closed, the plaintiff submitted to Carl Schlemeyer a proposed labor contract; said proposed contract was never signed at the end thereof by the plaintiff, but the plaintiff admits that he wrote his name in the body of the contract. The second and third paragraphs of the proffered contract read as follows:

"'Witnesseth, Whereas said first party has a block of oil and gas leases leased for development and is desirous of drilling a test well upon said acreage, and has now secured all the necessary equipment for the drilling of said test well, some which first party owns and some by contract for the use of the equipment as per contract hereto attached, all of which shall be placed on the location by party of first part, derrick erected, slush ponds made, water and fuel in tanks and the rotary tools on location all ready to install.'

"'It is understood and agreed by both parties that said second party is to install the rotary equipment, first party to furnish all labor necessary to prosecute the drilling of said well, with due diligence, to the depth of 3,200 feet or if drilling ahead is stopped by demand of first party for reason deemed advisable by first party then the casing is to be set as ordered by first party.'

"The receipt signed by plaintiff for items delivered does not include any 11-inch cones or bits, but does include two 9⅝-inch rock bits and two 9⅝-inch rock bit drill collars. About the time that plaintiff signed the receipt above mentioned the plaintiff also signed a receipt of a list of tools borrowed from Carl Schlemeyer, and among said list was one set of 9⅝-inch Hughes self-cleaning cones, new.

"About the latter part of January, 1933, or the early part of February of that year, the plaintiff sent trucks to haul the machinery in question, instructing the truck drivers that Carl Schlemeyer would check out to them the machinery to be hauled. Two loads were delivered the first day and two more loads the following day, and plaintiff assisted and directed in unloading the same; the Acme No. 2 draw works, the same being a substantial part of the smaller of the two rotary rigs, was in said delivery, in connection with

other incidental equipment for the smaller rotary rig, and some equipment that was suitable for use with either of defendants' rotary rigs.

"The court finds that the plaintiff was sufficiently familiar with oil-drilling machinery to recognize and realize the difference between said rotary rigs, and that he knew, on receiving the same, that the smaller of the rotary rigs was being delivered to him, and that he made no protest or complaint as to the items delivered. Some time later he caused about five more loads of said machinery to be hauled, and thereupon installed the same preparatory to drilling an oil well.

"The court finds that with full knowledge of the fact that the smaller of defendants' rotary rigs had been delivered to him, the plaintiff proceeded to and did use the same for the purpose of drilling the well referred to in the contract, and upon reaching the depth of approximately 1,400 feet with said equipment, the mud-hog pump which plaintiff had received as a part of the equipment of the small rotary rig, became out of repair and the plaintiff thereupon requested defendant Schlemeyer to release to him a larger mud-hog pump which Schlemeyer had retained at what is known as the Smith location. The defendant Schlemeyer then informed plaintiff that the plaintiff had already received the machinery contracted for, and he refused to deliver plaintiff any additional machinery. Said refusal was prior to July 20, 1933."

The position of the plaintiff, Krueger, as stated in the brief of counsel, is this:

"The specifications of error numbered 2 to 5, inclusive, turn on the question of the sufficiency of the evidence to sustain the findings of the district court on the propositions included in such specifications. We realize that ordinarily this court will not disturb findings made on conflicting evidence. In the present case, however, the evidence is largely embodied in the written contract itself. Therefore, it is within the province of the supreme court to consider whether the district court may not have erred in its construction of such contract under the evidence.

"Stated in a concrete form, the question is whether appellant Krueger was entitled to the 'large mud-hog pump and the 7½-inch R. B. Ideal draw works and rotary table' under the written contract. The contract specifies 'a small rotary drilling rig and equipment capable of drilling to a depth of 4,000 feet.' Under the undisputed testimony, the Acme draw works and corresponding rotary table with the 4-inch drill stem had been discarded (Abs. 40), by the owners back in 1929, because it was incapable of drilling to the depth desired and required by them in their tests on the St. John lease southwest of Morland. This equipment had drilled four wells to depths ranging from 1,600 to 2,600 feet (Abs. 39), and on the last well, being the St. John No. 1, had been used to drill to a depth of 3,840 feet, at which point it was discarded by them and the 7½-inch R. B. Ideal draw works and rotary table installed (Abs. 38). With the Ideal draw works this well, as also several others, were drilled to a depth greater than 4,000 feet . .

"This is not an ordinary case of weighing conflicting testimony. We have before the court for consideration a written contract, the vital phraseology of which was selected by the owners of the property. They knew from experience

what their equipment was capable of doing. When they revamped the contract and put into it the words 'a small rotary rig and equipment capable of drilling to a depth of 4,000 feet,' did they have in mind that part of the equipment which had drilled several wells to 4,000 feet and deeper, and which was then located at the Smith well and had been there pointed out to appellant by Uerling and Schlemeyer? Or did they have in mind the discarded equipment on the St. John lease which had drilled several wells to depths ranging only from 1,600 to 2,600 feet, and one well to 3,840 feet, at which point it was discarded for the other equipment? Did they have in mind the equipment mentioned in the written contract to be used by Krueger for drilling a well, or the property mentioned by Mr. Uerling, verbally, which he simply desired carried along to Krueger's well in order to keep all of the Nebraska syndicate property in one place? (Abs. 14.) Opinion testimony that the Acme equipment was capable of drilling a well to a depth of 4,000 feet would be incompetent as indicating what was in the minds of the owners and what was their intention when they put into the contract the words 'capable of drilling to a depth of 4,000 feet.' Did the owners intend to bind themselves by what amounts to a warranty that the Acme equipment was capable of drilling to a depth of 4,000 feet, when from their own experience they knew that it was incapable of doing so?"

It will be noted that counsel recognizes the rule that this court is not a trial court and will not weigh the evidence nor disturb the findings made on conflicting evidence. Undaunted, counsel point to the contract which recited: "Whereas, parties of the second part now own and control a small rotary drilling rig and equipment, capable of drilling to a depth of 4,000 feet, which property first party is desirous of renting," and argue vehemently that this language describes the large drilling outfit. Counsel insist that as the small equipment could not drill to a depth of 4,000 feet the parties had in mind the large equipment. This argument of counsel cannot be sustained by the evidence and is contrary to the findings of the court above quoted. The court saw the witnesses, heard the evidence, and there is no ground upon which this court can disturb the findings.

While this conclusion ends this lawsuit, we will briefly note the other specifications of error.

It is claimed that the plaintiff is entitled to a new trial on the ground of newly discovered evidence. This was based on the affidavit of Gilbreath to the effect that in March, 1933, he talked with Uerling about leasing certain rotary drilling equipment then in the possession of Schlemeyer, and Uerling stated he could not deal with affiant because it was under lease contract with Krueger. Three answers to this contention may be suggested.

In *Bice v. Nelson*, 105 Kan. 23, 180 Pac. 206, it was stated: "It

was not error to refuse a new trial for the purpose of allowing the plaintiff to produce impeaching evidence claimed to have been newly discovered." (p. 26.)

In *Haughton v. Bilson,* 90 Kan. 360, 133 Pac. 722, it was stated that where the trial of the action was by the court without a jury an order denying a petition for a new trial based on newly discovered evidence will not be reversed if upon the whole case the decision is sustained by the evidence.

A third answer is that the matter set forth in the affidavit appears to be of slight importance, and would not justify a new trial, even though otherwise unobjectionable.

It is claimed that there was error in holding that the Acme 4-inch draw works and rotary table were capable of drilling a well to 4,000 feet, and also in the finding as to the levy made by the sheriff. These findings were made on ample evidence and will not be disturbed.

It is claimed that the court erred in finding more than nominal damages, as Schlemeyer, by the prior injunction suit, was enjoined from the use and possession of the equipment in question. This is based on the assumption that the injunction suit ousted Schlemeyer from possession. The history of the injunction suit and the restraining order issued by the probate court, which was later dissolved on application of Schlemeyer, is too long to be recited here. It is enough to say it did not affect the right of possession of Schlemeyer to the equipment, and this point is ruled against plaintiff.

The finding as to the value of the property was substantiated by competent testimony, and must be sustained.

The only remaining question, and perhaps the most important, is as to the measure of damages. In replevin the general rule is that the successful party is entitled to recover for the detention the value of the use of the property. (*Cornwell v. Moss,* 99 Kan. 522, 162 Pac. 298; *Yandle v. Kingsbury,* 17 Kan. 195; 17 C. J. 878; *Allen v. Fox,* 51 N. Y. 562.)

Under the findings of the court Schlemeyer was entitled to possession. The contest here was not between the owners and Schlemeyer, but between Krueger, who was a stranger to the title, and Schlemeyer, who was in lawful possession. In such case the rule is that the entire value may be recovered, and the owner of the special interest, Schlemeyer, is answerable over to the general owners for whatever interest remains after his special claim is satisfied. (*Dil-*

*worth v. McKelvy,* 30 Mo. 149; *Enfield v. Stewart,* 24 N. M. 472, 174 Pac. 428.)

Finally, it may be added that plaintiff had but a single cause of action and was not entitled to split his cause of action and harass the defendant with two replevin suits. (*Thisler v. Miller,* 53 Kan. 515, 36 Pac. 1060; *First Nat'l Bank v. Schruben,* 125 Kan. 417, 265 Pac. 2d 53.)

We have examined all of the errors specified, and find no ground for reversal of the judgment of the trial court.

The judgment is affirmed.